**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

STEPHEN KYLE MARTINEZ,      )
                                    )
          **Plaintiff,**        )
                                      )
             **v.**             )    **No.  21 C 50118**
                                      )
**MERRILL ZAHTZ, and WEXFORD**   )    **Judge Rebecca R. Pallmeyer**
**HEALTHCARE SERVICE, INC.**      )
                                      )
         **Defendants.**      )

## MEMORANDUM OPINION AND ORDER

Plaintiff Stephen Martinez, while incarcerated at Dixon Correctional Center ("Dixon"), a prison of the Illinois Department of Corrections ("IDOC"), contracted salmonella and shigella infections.  The infections caused Martinez to suffer from diarrhea, moderate to severe abdominal pain, loss of appetite, and unintentional weight loss.   After his infections cleared, Martinez nonetheless continued to experience recurrent gastrointestinal distress, and was later diagnosed with post-infectious irritable bowel syndrome.   Martinez claims (1) that Dr. Merrill Zahtz, a physician employed as the Medical Director at Dixon, was deliberately indifferent to Martinez's medical condition in violation of the Eighth Amendment, and (2) that the policies or practices of Zahtz's employer, Wexford Healthcare Service, Inc. ("Wexford")—a corporation that contracts with IDOC to provide medical care to inmates—were the moving force behind the constitutional violation Martinez suffered.  Zahtz and Wexford have moved for summary judgment [130].

It is undisputed that Martinez, while incarcerated, suffered from a condition that is serious and deeply unpleasant under the best of circumstances.  Nonetheless, as fully explained below, the court finds that Martinez has failed to present sufficient evidence that Zahtz was deliberately indifferent in treating Martinez, or that any inadequacies in Martinez's treatment were a product of a policy or practice of Wexford.  Defendants' motion for summary judgment is granted.

## BACKGROUND

In considering Defendants' motion for summary judgment, the court construes the evidence in the record in the light most favorable to Martinez and draws all reasonable inferences from that evidence in his favor.  *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020) (citations omitted).

At all times relevant to this case, Martinez was incarcerated at Dixon.  (Defs. Local Rule 56.1 Statement of Facts (hereinafter "DSOF") [134] ¶ 1; Pl. Local Rule 56.1 Statement of Additional Facts (hereinafter "PSOAF") [144-2] ¶ 1.)  Defendant Wexford is a corporation based in Pittsburgh, Pennsylvania, that holds a contract with the State of Illinois to provide medical care and treatment to inmates throughout the IDOC, including at Dixon.  (DSOF ¶ 3.)  Defendant Zahtz was employed by Wexford as the Medical Director at Dixon at the time relevant to this case; Zahtz's job duties included providing medical care and treatment to inmates at the prison and participating in "collegial reviews" regarding requests for off-site medical care and services for inmates at Dixon, such as referrals to specialists or certain kinds of lab tests.  (*See id.* ¶ 2.)  Collegial reviews involved Zahtz's conferring by phone with a reviewing Wexford physician, stationed in Pittsburgh, regarding the necessity of the requested offsite treatment or services.  (*Id.* ¶¶ 30–32; PSOAF ¶ 24.)  If the reviewing physician determined that the offsite services requested were not medically necessary, they would recommend an alternative treatment plan for other on-site treatment options that had not yet been tried; if a referring provider like Zahtz disagreed with the non-approval, they could submit an appeal of that decision to Wexford.  (DSOF ¶¶ 31–32.)

I.      **Martinez's Treatment by Zahtz and Other Medical Professionals at Dixon**

     A.      **Martinez's Initial Complaints and Zahtz's First Course of Treatment**

On April 11, 2018, Martinez saw Dr. Zahtz for a medical visit at Dixon; during the visit, Martinez reported that for the past two weeks he had experienced abdominal pain and frequent diarrhea containing mucus.  (PSOAF ¶ 2.)  Martinez described the severity of his abdominal pain

as a four or five on a scale of one to ten but increasing to an eight at certain moments of cramping. (*Id.*)  When Zahtz examined Martinez, Zahtz found that Martinez's vital signs were normal, that he was not in "acute distress," and that Martinez's abdomen was "soft."  (DSOF ¶ 5.)  Martinez's weight was recorded as 227 pounds.  (Pl. Resp. to DSOF [144-3] ¶ 60.)  Zahtz observed that while Martinez did not have any "epigastric tenderness," Martinez reported "mild" tenderness in the "left upper quadrant" of the abdomen.  (DSOF ¶ 4.)  As Zahtz testified, the epigastrium, or epigastric region, is the upper central area of the abdomen located just below the rib cage.  (Zahtz Dep. [134-3] at 93:2–7.)

Zahtz noted that he did not think Martinez's illness was infectious.  (PSOAF ¶ 3.)  Zahtz held that view, at least in part, because Martinez reported at this visit that he had recently changed his diet.  (DSOF ¶ 6.)  Zahtz's notes do not describe what the change in diet was, and Zahtz testified that he had no independent recollection of the nature of the dietary change.  (Zahtz Dep. at 94:4–19.)  Martinez does not directly contest that he reported a change in diet to Zahtz at that time.  (*See* Pl. Resp. to DSOF ¶ 6.)  He did testify that, as a general matter, his diet consisted of "[w]hatever they sold on commissary or gave us in the chow hall," food that Martinez described as "[s]lop" and "things you can find in a gas station."  (Martinez Dep. [134-1] at 18:20–19:7.)  He could not, however, recall any specifics as to what he might have purchased from the commissary around the time of the April 11 visit.  (*Id.* at 19:8–11.)  In any event, Martinez disputes that the reported dietary change, whatever it may have been, could have caused him to experience diarrhea.  (Pl. Resp. to DSOF ¶ 6.)  The court understands Martinez to contest that the dietary change was the cause of his diarrhea in this instance, specifically, and not the general notion that a dietary change *can* cause diarrhea.

In any case, based on Martinez's report of a changed diet, Zahtz formed the view at that time that Martinez's symptoms resulted from indigestion and/or heartburn.  (PSOAF ¶ 3.)  Zahtz prescribed Imodium and Pepto Bismol, two medications that can treat at least some instances of

diarrhea, gastrointestinal upset, and stomach aches. (*Id.* ¶ 4.) Zahtz further ordered that Martinez could have a "lay-in" for the remainder of that week. (DSOF ¶ 6; Zahtz Dep. at 95:3–4.) As Zahtz testified, a lay-in is a period of time where an inmate is excused from going to the prison dining facility (the "chow hall") for meals, performing work, or attending educational sessions; in short, during a lay-in, the inmate may have extended rest in their cell without disruptions. (Zahtz Dep. at 95:5–17.) Zahtz did not prescribe any other treatment or dietary course for Martinez at this visit, did not schedule a follow-up visit, and did not order any further observation at that time. (PSOAF ¶ 4.)

Two days after this medical visit, on April 13, 2018, Martinez made a "crisis call" regarding his condition; neither party explains exactly what a crisis call is or who exactly Martinez communicated with, but the court understands that Martinez made an emergency communication with someone at Dixon about his condition. (*Id.* ¶ 5.) Martinez reported in the crisis call that he felt like he was dying, that his abdominal pain had reached a ten out of ten, and that he constantly felt the need to use the bathroom. (*Id.*)

Martinez saw a nurse practitioner at Dixon named Susan Tuell for treatment later that same day. (DSOF ¶ 8.) Martinez reported to Tuell that he had experienced abdominal pain, low back pain, and frequent diarrhea since his last visit with Zahtz, though he did not report suffering from fever, chills, or vomiting. (*Id.*) It appears that Martinez's condition had improved somewhat since the time of his crisis call, because he does not dispute that upon examining him, Tuell observed that Martinez was not in acute distress, that his vital signs were normal and that he did not exhibit tenderness in his back or pain in his flank. (*Id.* ¶ 9.) Martinez further reported that he had been drinking fluids but his food consumption consisted only of crackers, ramen noodles, and rice. (*Id.* ¶ 8.) At this visit, Tuell collected a stool sample, which she described in her notes as watery but without mucus or discoloration, and which she later submitted for testing. (*Id.* ¶ 10; Ex. 3 to Defs. Ex. B [134-2] at 21.) She then admitted Martinez to the prison infirmary for further

4

observation and prescribed Tylenol and Prilosec, a medication that, she explained in her deposition, is "used for stomach cramping pains," and as "an acid blocker" to address gastroesophageal reflux disease, also known as "GERD." (DSOF ¶ 10; Tuell Dep. [134-7] at 135:5–9.)

The testing Tuell ordered of Martinez's stool sample, which was completed that same day (April 13, 2018), revealed what Tuell described as a "significant" white blood cell count. (DSOF ¶ 11; Tuell Dep. at 58:23–59:2.) Tuell testified that an elevated white blood cell count in a stool sample is consistent with the patient's fighting an infection, but could also be a vestige of a past infection, and that the white blood cell count "does not really specify the degree of the infection at the time." (Tuell Dep. at 59:9–60:9.) Following this discovery, an unnamed "on-call physician" at Dixon prescribed an antibiotic called Flagyl for Martinez, as well as a pain medication called Ultram, and directed Martinez to increase his fluid intake. (DSOF ¶ 11.)

Martinez now asserts that "[t]here was no culture sensitivity testing results or any other kind of indication provided" as to why he was prescribed Flagyl in particular. (PSOAF ¶ 8.) Martinez does not explain what culture sensitivity testing is or why it would be necessary, but the court understands Martinez to refer to some kind of testing that would reveal what pathogens, if any, were present in Martinez's stool that might have caused an infection.

According to a declaration submitted by Zahtz, Flagyl is a "common antibiotic used to treat infections of the gastrointestinal tract." (DSOF ¶ 11.) Martinez disputes Zahtz's characterization and contends that Flagyl "is used to treat bacterial infections in different parts of the body," citing a page about the drug on the Mayo Clinic website. (*See* Pl. Resp. to DSOF ¶ 11.) The written statements on the Mayo Clinic website, offered for the truth of what they assert, are hearsay. *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023). More importantly, however, Martinez's description of the language in the website is misleading: Martinez contends the website confirms that Flagyl is only used to treat infections in parts of the body *other than* the gastrointestinal tract.

5

In fact, the webpage describes Flagyl (generic name Metronidazole) as being "used to treat bacterial infections in different areas of the body." *Metronidazole*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/metronidazole-oral-route/description/drg-20064745 (last visited September 15, 2025).[1]

On April 16, 2018, Martinez saw Tuell in the infirmary for a follow-up visit.  (DSOF ¶ 12.) Martinez reported that his pain was decreasing and that his stools were firmer and less frequent. (*Id.*)  Tuell noted, again, that Martinez was not in acute distress at the time of the visit.  (*Id.*)  She instructed Martinez to increase his food intake and avoid spicy foods, and she planned to follow up with him again in a week.  (*Id.*)  Martinez does not dispute this account, but contends that his symptoms had not completely resolved at this time, and that the Flagyl and Ultram were not effective, or at least not fully effective, in treating his condition.  (Pl. Resp. to DSOF ¶ 12.)

Martinez had another follow-up visit with Tuell in the Dixon infirmary on April 20, 2018. (DSOF ¶ 13.)  Martinez reported that he had received a blister pack of his medications so that he could take them on his own and further reported that while he was still experiencing on-and-off abdominal discomfort, his stools were now more formed.  (*Id.*)  Tuell again noted that Martinez was not in acute distress.  (*Id.*)  When Tuell saw Martinez for yet another follow-up visit on April 23, 2018, Martinez reported that his diarrhea was gone, though he also reported a lack of appetite and some pain in the right lower quadrant of his abdomen.  (*Id.* ¶ 14.)  Tuell observed upon examination that Martinez had no fever or chills, was maintaining his weight, and had "normal bowel sounds" throughout his abdomen, though she continued to note some tenderness in the abdomen.  (*Id.* ¶ 15.)  At that stage, Martinez had one day left of his Flagyl prescription.  (*Id.*)

---

[1]     Martinez also cites an article published on the database UpToDate as evidence that "the most common adverse effects" associated with Flagyl/Metronidazole are gastrointestinal. (*See* PSOF ¶ 8; *see also* Pl. Ex. 104 [143-48].)  Again, the printed statements in the article are hearsay, but even if the court accepted that point as true, Martinez presents no evidence that the side effects are common enough that prescribing Flagyl is inappropriate where the suspected infection is gastrointestinal.

On April 24, 2018, Tuell requested a series of tests for Martinez called a "GI panel by PCR"; this panel tests for various pathogens that can be found in stool, including salmonella and shigella. [2] (PSOAF ¶¶ 10–11.) Tuell's request was directed to and reviewed by a Dr. Neill Fisher, a reviewing physician employed by Wexford. (DSOF ¶ 16; Fisher Dep. [134-5] at 21:2–7; *see generally* Fisher Denial Email [134-5].)

Fisher denied Tuell's request for the GI panel by PCR. (PSOAF ¶ 12.) As Fisher wrote in an email to Tuell at that time, and as he reiterated at his deposition, the pathogens detected by the panel "are all associated with acute diarrhea." (Fisher Denial Email [134-5] at 1; Fisher Dep. [134-5] at 61:5–8.) If Martinez was responding to the antibiotics, Fisher continued, he could not "see a clear need for" the GI panel by PCR; Fisher denied approval for the test at that stage but asked Tuell to re-submit the request if there was "additional history to be considered." (Fisher Denial Email at 1; Fisher Dep. 60:18–24.) Dr. Zahtz was notified of Fisher's denial of the panel request at the time. (PSOAF ¶ 14.)

On April 28, 2018, Martinez reported during a psychiatric care visit at Dixon that his stomach pain was improving but that his appetite was low. (*Id.* ¶ 15.) And his gastrointestinal symptoms had recurred: Martinez reported to a nurse during an outpatient visit at Dixon on May 2, 2018, that he was again experiencing mucus in his stool and that he had "knife-like" and "cramping" abdominal pain. (*Id.*; *see also* Martinez Outpatient Notes [137-9] at 17.) Martinez saw Nurse Practitioner Tuell for another visit a day later and reported to Tuell that his abdominal pain persisted, that his stool had become loose again, and that his pain became worse with eating, though he had eaten all his lunch that day. (DSOF ¶ 18.) After examining Martinez at this visit,

---

[2]     The parties do not define "PCR," but the court understands that it stands for "polymerase chain reaction," a "technique used to make numerous copies of a specific segment of DNA" that can be used "for various experiments and procedures in molecular biology, forensic analysis, evolutionary biology, and medical diagnostics." *Polymerase Chain Reaction*, ENCYCLOPEDIA BRITANNICA, https://www.britannica.com/science/polymerase-chain-reaction (last visited Sept. 15, 2025).

Tuell made a note in Martinez's medical record questioning whether Martinez might have irritable bowel syndrome, although it is not clear whether Martinez discussed this possibility with Martinez at the time. (*Id.* ¶ 19; Ex. 10 to Defs. Ex. B [134-2] at 29.) Tuell again prescribed Prilosec for Martinez, and added a prescription for Simethicone, a medication used to treat bloating and pain caused by excessive gas. (*Id.*) She also ordered a "KUB x-ray" of Martinez's abdomen; Tuell testified that the acronym KUB stands for "kidney, ureter, bladder," and equates to "a full abdominal x-ray." (*Id.*; Tuell Dep. at 134:8–17.) The x-ray, eventually taken on May 7, 2018, showed results deemed "unremarkable." (DSOF ¶ 20.)

Later on May 3, 2018, after he was seen by Nurse Practitioner Tuell, Martinez filed an emergency grievance. (PSOAF ¶ 16.) The grievance recounted the gastrointestinal pain Martinez had experienced over the previous month, described his April 13 crisis call, and complained that the antibiotics he had been prescribed had not worked. (*Id.*) Martinez further stated that he felt Dr. Zahtz had brushed aside Martinez's concerns at their previous meeting by suggesting that he was merely suffering from indigestion and heartburn. (*Id.*) Martinez requested to be seen by a specialist. (*Id.*)

Instead, the warden directed that Martinez again be seen by Dr. Zahtz. (*Id.*) At a May 10, 2018 visit, Zahtz noted that Martinez's symptoms had not completely resolved during the time he was on Flagyl, and had returned in the ten days since then. (*Id.* ¶ 17; DSOF ¶ 21.) Upon exam, Zahtz observed that Martinez was not in acute distress and that his vital signs were normal; Zahtz noted "minimal epigastric tenderness" and "some left upper quadrant tenderness" in Martinez's abdomen. (DSOF ¶ 22.) Zahtz acknowledged Martinez's recurrent diarrhea, abdominal pain, and reported weight loss, but noted that he did not find Martinez's weight at that time, 215 pounds, to be concerning. (*Id.* ¶ 23.) Zahtz ordered several lab tests, including a stool sample and the previously denied GI panel by PCR. (*Id.* ¶¶ 23–24.) Zahtz also prescribed a further two-week course of Flagyl and a three-week course of Pepto Bismol; per Zahtz, both were to begin after

8

stool sampling had been completed.[3]  (*Id.* ¶ 23.)  The following day, Dr. Fisher, the physician at Wexford Health who had previously denied Tuell's request for the GI panel by PCR, approved Zahtz's request for the testing.  (*Id.* ¶ 24.)

Martinez reported to a nurse during an outpatient visit at Dixon on May 14, 2018 that he was experiencing both diarrhea and constipation and that his stool had taken on a "dark" shade, though he could not tell if blood was present in his stool.  (PSOAF ¶ 19.)  During this visit, Martinez's temperature was measured at 100 degrees.  (Martinez Outpatient Notes [137-9] at 24.)  When he saw Zahtz for another visit the following day, May 15, 2018, Martinez continued to report persistent abdominal discomfort and recurrent diarrhea, somewhat relieved when he had taken Imodium.  (DSOF ¶ 25.)  Zahtz subsequently prescribed Martinez more Imodium.  (PSOAF ¶ 20; DSOF ¶ 27.)  By this time, some of Martinez's lab tests results had been returned and showed no evidence of "significant inflammation" (presumably, of the gastrointestinal tract), but Martinez's stool sample testing was still pending.  (DSOF ¶ 26.)  Zahtz noted that he would consider a GI consultation for Martinez depending on the results of the pending stool sample results.  (*Id.* ¶ 27.)

### B.    Martinez's Salmonella and Shigella Diagnosis and Zahtz's Second Course of Treatment

The following day, May 16, 2018, Zahtz received the results of Martinez's stool sample, which was positive for two kinds of disease-causing bacteria: salmonella and shigella.  (*Id.* ¶ 28.)  Zahtz noted that Martinez had reported improvement with his second round of Flagyl but determined nevertheless to house Martinez in the infirmary at Dixon for a 23-hour observation and to start Martinez on a different antibiotic called Ciprofloxacin, commonly used to treat salmonella infections.  (*Id.*)  Martinez was admitted to the Dixon infirmary that day.  (PSOAF ¶ 21.)

---

[3]     Martinez asserts that his medical records show that he was administered Flagyl that same day, May 10, 2018.  (PSOF ¶ 18.)  The only copy of the particular record that the court is able to locate on the docket, however, was filed fully redacted.  (*See* Pl. Ex. 21 [143-12].)

On May 21, 2018, Zahtz conferred with a reviewing physician at Wexford, Dr. Hector Garcia, regarding a referral request to send Martinez for a consultation with a gastrointestinal specialist. (DSOF ¶¶ 29–30.) After Zahtz discussed the referral request and Martinez's treatment with Garcia, Garcia proposed an alternative treatment plan that consisted of additional lab tests and requested a follow-up with Zahtz by June 4, 2018. (*Id.* ¶ 33.)

Dr. Zahtz saw Martinez for a follow-up visit in the infirmary on May 24, 2018. (*Id.* ¶ 34.) Martinez reported in that visit that he was doing better and had no diarrhea, though he still had some recurrent, on-and-off abdominal pain. (*Id.*) Zahtz hypothesized that this pain might be related to increased gas. (*Id.* ¶¶ 34–35.) After examining Martinez, Zahtz assessed Martinez as suffering from "post infective diarrhea with shigella and salmonella." (*Id.* ¶ 35.) Zahtz determined to begin decreasing Martinez's dose of Imodium and to taper it down until Martinez's use of the medication could be discontinued altogether. (*Id.*) Based on his observation at the May 24 visit that Martinez's diarrhea was resolving, Zahtz would later decide on May 30 that a consultation with a gastrointestinal specialist was not necessary after all. (*Id.* ¶ 36.)

At Martinez's next appointment with Zahtz on June 6, 2018, Martinez reported that he had stopped taking Imodium—presumably, according to Zahtz's instructions for dose reduction—and that his diarrhea returned four days thereafter. (*Id.* ¶ 37.) When he resumed taking Imodium, Martinez reported, his stools returned to normal, though he experienced some increased gas and abdominal discomfort. (*Id.*) Given what Zahtz viewed as Martinez's positive response to Imodium and the prior course of Ciprofloxacin, Zahtz determined to treat Martinez's ongoing abdominal discomfort and gas with these medications and to follow up with him in a month. (*Id.* ¶ 38.)

The planned follow-up visit took place on July 3, 2018. (DSOF ¶ 39.) At this appointment, Martinez reported that he was "doing ok" with his bowel movements but still had some "mucus-type" stools on occasion. (*Id.*) He also reported symptoms consistent with an upper respiratory infection and seasonal allergies (neither side suggests these symptoms were related to Martinez's

10

gastrointestinal issues). (*Id.*) Zahtz prescribed three medications—Claritin, Guaifensenin, and Nasacort—for Martinez's respiratory issues. (*Id.* ¶ 40.) He further noted that Martinez's salmonella infection had resolved, and that Martinez did not have any complaints of abdominal pain or diarrhea that warranted further medications or intervention. (*Id.*) Without explaining what steps he believes Zahtz should have taken, Martinez appears to assert that the persistence of his "mucus-type stools" did, in fact, warrant further medication or intervention at this stage. (Pl. Resp. to DSOF ¶ 40.)

### C. Martinez's Recurrence of Symptoms in Fall 2018

There is little evidence in the record concerning Martinez's condition for the next several months of 2018. Martinez asserts that from June through "the rest of 2018" he "continued to experience gastrointestinal symptoms." (PSOAF ¶ 27.) But Martinez has not cited any testimony or evidence to this effect. Instead, as Defendants point out, the statement is supported only by two pages of Martinez's outpatient notes, which show that Martinez sought treatment for a headache on June 14, 2018 and mentioned that he had been treated for gastrointestinal symptoms over the previous two months. (Def. Resp. to PSOF [148] ¶ 27; Martinez Outpatient Notes [137-9] at 35–36.)

On November 2, 2018, Martinez saw Nurse Practitioner Tuell for an appointment related to his dyslipidemia (elevated blood cholesterol), again of no apparent connection to his gastrointestinal complaint. (DSOF ¶ 41.) Martinez reported that he had been taking his medications as ordered, but could still only eat certain foods, such as noodles and rice, without experiencing resulting abdominal pain and diarrhea. (*Id.*) Martinez admitted to Tuell that he had eaten a burrito for lunch that day, however, and was experiencing diarrhea, gastrointestinal upset and abdominal pain. (*Id.* ¶¶ 41–42.) Following this visit, Tuell submitted a referral request to Wexford for Martinez to undergo a colonoscopy at the University of Illinois-Chicago ("UIC") Hospital; in her request, Tuell noted that Martinez had a history of diarrhea and unintentional

weight loss, and that he had been treated for salmonella. (*Id.* ¶ 42.) She also noted that Martinez weighed 209.5 pounds at the time of her request, down from 216 pounds on May 31, 2018. (*Id.*) Tuell's request for a colonoscopy at UIC was later altered—whether by Tuell or someone else at Dixon or Wexford is unclear—to a referral for a consultation with a gastrointestinal specialist. (*Id.*)

At a follow-up visit with Tuell on November 14, 2018, Martinez continued to complain of stomach pain. (PSOF ¶ 29.) Tuell reviewed Martinez's commissary records and noted Martinez's purchase of spicy foods. (DSOF ¶ 43.) The foods in question, or dates of these purchases, are not in the record, but Martinez does not deny these purchases; he explained that he purchased the spicy foods to trade within the prison, rather than to eat himself. (*Id.*)

On November 28, 2018, Dr. Zahtz conferred with Dr. Stephen Ritz at Wexford regarding Tuell's request for Martinez to have a consultation with a gastrointestinal specialist. (*Id.* ¶ 44.) Ritz approved the request at that time, but for reasons that are not explored by either party, the consultation at UIC did not take place for several months. (*Id.* ¶¶ 44–45.)

On April 16, 2019, Martinez saw Dr. Barbara Jung for a consultation at UIC's GI clinic. (PSOAF ¶ 30.) Jung did not make any diagnosis as to Martinez's condition, although it appears she believed it was possible that Martinez's symptoms owed to a "food sensitivity issue," irritable bowel disorder, or an ulcer. (DSOF ¶ 45.) Jung recommended that Martinez undergo a series of lab tests: "testing for a c. diff infection, stool ova and parasites, TSH levels, and testing for celiac levels" and that he undergo an "EGD" (a procedure examining the upper gastrointestinal tract) and a colonoscopy, that he be referred to a neurologist (evidently based on Martinez's report of a "remote history of seizures"), and that he be treated with Imodium for diarrhea. (*Id.* ¶¶ 45–46.)

On April 30, 2019, Martinez saw Dr. Zahtz back at Dixon for follow-up from his GI consultation with Dr. Jung. (*Id.*) Martinez reported that his diarrhea had "subsided," but that he continued to experience "loose stools" periodically. (*Id.* ¶ 46.) Based on Martinez's report regarding his diarrhea, Zahtz did not believe the stool testing Jung had recommended was

necessary at that time but otherwise planned to complete the lab tests Jung had ordered and to prescribe more Imodium for Martinez. (*Id.*) Zahtz did submit referral requests to Wexford for Martinez to undergo the EGD and colonoscopy, and to see a neurologist as Jung had recommended. (*Id.*) On May 9, 2019, Zahtz conferred again with Dr. Ritz of Wexford regarding these referrals; Ritz approved the referrals for Martinez to undergo an EGD and colonoscopy, but apparently not to see a neurologist. (*Id.* ¶ 47.)

Between May and September 2019, Martinez continued to complain of gastrointestinal issues; there is no record, however, of any further visits with or involvement of Dr. Zahtz. Instead, Martinez's complaints—on May 11, that he had seen blood in his stool, and on both June 11 and August 1 that his appetite was low—were made to a nurse at Dixon and to Martinez's psychiatrist, respectively. (*See* PSOAF ¶ 32.)

Martinez did undergo both the EGD and colonoscopy at UIC on September 4, 2019, under the care of Dr. Russell Brown. (DSOF ¶ 48.) Based on the results of these procedures, Brown diagnosed Martinez as suffering from "post-infectious irritable bowel syndrome"; the parties do not define this condition, but the court understands that irritable bowel syndrome is characterized by chronic or recurring gastrointestinal upset. (PSOAF ¶ 31.) Dr. Brown recommended that Martinez "resume his normal diet," that he be prescribed Lomotil (another medication used to treat diarrhea), return to the GI clinic in four months for a follow up, and undergo a repeat colonoscopy at age 50. (DSOF ¶ 48.) When Martinez again saw Dr. Zahtz later that day, however, Dr. Zahtz prescribed Imodium as a substitute for Lomotil; Zahtz chose to avoid Lomotil because it contains an opiate. (*Id.* ¶ 50.) Dr. Zahtz also concluded that a further follow-up at UIC's GI clinic was not medically necessary at that time because it appeared that Martinez's gastrointestinal issues had been addressed and resolved. (*Id.*)

In fact, however, Martinez continued to complain of gastrointestinal symptoms periodically from September 2019 until he was transferred from Dixon to another IDOC facility in the summer

13

of 2021. (*See* PSOAF ¶¶ 1, 32–34.) There is no record that any of Martinez's continuing complaints were directed to Zahtz, however. The last interaction between Zahtz and Martinez described in the record is a December 23, 2019 visit at which Zahtz saw Martinez for an injury to his right hand. (DSOF ¶ 51.) Martinez claims he was still suffering from symptoms of post-infectious irritable bowel syndrome at that time, but does not challenge Zahtz's assertion that he did not complain of diarrhea or abdominal during the December 2019 visit. (*See* Pl. Resp. to DSOF ¶ 51.)

## II.     Wexford Policies

Besides taking issue with Zahtz's treatment decisions, Martinez asserts that several practices or policies of Wexford, formal or informal, were the moving force behind the Eighth Amendment violation he claims to have suffered. One of these asserted policies is the use of the "collegial review" process by which Wexford—via offsite personnel like Dr. Garcia, Dr. Fisher, and Dr. Ritz, mentioned above—would determine whether to approve requests for testing and referrals made by providers at Dixon like Zahtz and Tuell. (Opp. [144-1] at 14.) Martinez contends that Wexford's reliance upon "non-specialized remote employees" to handle such requests, combined with the incentives to deny care created by Wexford's asserted "adherence to cost efficiency," caused him to be "denied timely testing and consultation with a specialist." (*Id.* at 15.) Martinez also claims that Wexford's remote reviewers made decisions about requests for testing or referrals while having "no knowledge of an inmate patient's medical history." (*Id.*)

Wexford does not deny that its policies or decision-making may consider costs, but asserts that Martinez has failed to provide evidence that any particular treatment decision in his own case was influenced by cost. Nor has Martinez presented evidence of any instance in which a remote reviewer made any decisions without knowledge of his medical history. That the reviewing Wexford physicians did not have in-person or virtual contact with inmate patients (*see* PSOAF ¶

14

24) is not evidence that they had "no knowledge" of the patient's medical history.  (*See* Opp. [144-1] at 15.)

Other assertions regarding Wexford policies are similarly unsupported.  As a general matter, Martinez avers that referral requests from on-site doctors were not always accompanied by "supporting documents."  (Pl. Resp. to DSOF ¶ 30.)  The only evidence that he cites for this assertion appears to be the referral form that Nurse Practitioner Tuell completed when requesting a GI consultation for Martinez on November 2, 2018.  But that form does in fact recount Martinez's medical history of diarrhea and unintentional weight loss, treatment for salmonella, continued diarrhea and abdominal pain, and seven-pound weight loss between May 31, 2018, and November 2, 2018.  *See supra* at 11; Nov. 2, 2018 Referral Form [146-3].

Finally, Martinez asserts that "Wexford personnel, including Dr. Zahtz," have "employed an informal 'wait and see' or 'watch and wait' approach" to the treatment of inmates; under this approach, Martinez contends, instead of "taking steps to empirically determine the next best course of treatment, on-site clinicians employed by Wexford choose instead to 'wait and see' how the inmate patient fa[res]."  (PSOAF ¶ 37.)  Martinez describes this approach as a "widespread practice" across Wexford.  (Opp. [144-1] at 14.)  But the evidence he cites does not support this allegation, either.  He simply cites portions of testimony showing that in Martinez's own case, Tuell and Zahtz decided at certain points that the right choice was to wait and see how Martinez fared before deciding what to do next.  Leaving aside whether Tuell or Zahtz were right or wrong to do so, the record shows their decisions appeared to be based on observation and experience, rather than on some mandated practice.

Thus, in the first cited portion of Tuell's testimony, she was questioned by the examining attorney about a note she had made regarding Martinez's treatment on May 3, 2018, in which Tuell wrote "may consider Bentyl."  (Tuell Dep. [143-23] at 132:1–6; *see also* Martinez Outpatient Notes [137-9] at 19.)  The examining attorney asked of Tuell: "Why did you just write may

15

consider, as opposed to prescribing that medication?" (*Id.* at 132:7–8.) Tuell responded as follows:

> So Bentyl is a medication that deals with sometimes stomach cramping, abdominal pain. It's a little bit more of a step above in prescribing. When you're looking at things, you kind of take steps; you know, start with this kind of therapy. If that doesn't work you may go to this kind of therapy. So I wanted to see if what I had written first was going to be beneficial for the patient.

(*Id.* at 132:9–17.) Recall that, on May 3, 2018, Tuell had prescribed Martinez an additional course of Prilosec, as well as Simethicone. *See supra* at 7–8.

Martinez next points to a segment of Tuell's deposition wherein she was asked whether, in her opinion, it was "important to detect salmonella in a patient as soon as possible after their onset of symptoms." (*See* Tuell Dep. [143-23] at 192:19–21.) She responded:

> I really don't know. Generally when I have a patient present with symptoms that we describe such as diarrhea, nausea and vomiting . . . initially it's a watch and wait to see if it's some mild say influenza that is going to resolve on its own. It may not be an immediate assessment for it.

(*Id.* at 192:24–193:5.) The examining attorney asked, "You mentioned watch and wait. Is that a Wexford policy?" and Tuell responded, "I would not say specifically if it is or not. I really can't tell you." (*Id.* at 193:7–10.) When asked why she would choose to "watch and wait" with a patient exhibiting those kinds of symptoms, Tuell responded: "Because it's rare to have a patient that has salmonella. You're more likely to see a patient come in that may have gastritis and influenza, that kind of thing, and it can resolve on its own." (*Id.* at 193:14–18.)

Zahtz, too, was asked at his deposition about how salmonella infections should be treated. (Zahtz Dep. [143-26] at 153:5–6.) He stated: "Sometimes just wait and see. Treat symptomatically will work and sometimes antibiotic will work as well." (*Id.* at 153:10–12.) The examining attorney asked if Zahtz could expound on the phrase "wait and see" and explain what he meant by it. (*Id.* at 153:13–14.) Zahtz responded: "You treat symptomatically and wait and see how the patient does before you decide to do anything further." (*Id.* at 153:13–17.)

16

The examining attorney then asked Zahtz if the "wait and see" approach was something he considered a Wexford policy. (*Id.* at 153:23–24.) The deposition excerpt that Martinez cites in his own Statement of Additional Facts is cut off just before Zahtz's answer to the question, but the full transcript of Zahtz's deposition is included in Defendants' summary judgment papers. (*See* Zahtz Dep. [134-3].) Zahtz's answer to the question was "No, not at all." (*Id.* at 154:3.) Zahtz continued, explaining, "It's my own policy" and "It's my own clinical judgment. What I do is not dictated by Wexford." (*Id.* at 154:5–8.)

## DISCUSSION

### I. Zahtz

The Eighth Amendment's prohibition against cruel and unusual punishment creates a duty on the part of prison officials to provide adequate medical care to incarcerated individuals. *Boyce v. Moore*, 314 F.3d 884, 888 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). But not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Eagan v. Dempsey*, 987 F.3d 667, 688 (7th Cir. 2021) (quoting *Estelle*, 429 U.S. at 105). Inmates are "not entitled to the best care possible"; they are "entitled to reasonable measures to meet a substantial risk of serious harm." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (citation omitted). Further, it is not enough for the inmate to show that he, in fact, received sub-standard medical care, as even conduct rising to the level of medical malpractice "does not become a constitutional violation merely because the victim is a prisoner." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc), *as amended* (Aug. 25, 2016) (quoting *Estelle*, 429 U.S. at 106). To succeed on this species of claim, a plaintiff must show (1) that they had an objectively serious medical need, and (2) that the defendant was *deliberately indifferent* to that need. *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (citation omitted) (emphasis added).

At summary judgment, Zahtz does not contest that Martinez's condition was objectively serious. The question is whether the summary judgment record, viewed in the light most favorable to Martinez, creates a genuine issue of fact as to whether Zahtz was deliberately indifferent to Martinez's condition. The court finds it does not.

Evidence of a prison official's deliberate indifference is almost always circumstantial, as defendants will rarely declare something to the effect of "'I knew this would probably harm you, and I did it anyway!'" *Petties*, 836 F.3d at 728. Where the defendant is a medical practitioner, and the circumstantial evidence concerns their course of action in treating the prisoner, the plaintiff must show that the practitioner's treatment choices constituted "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citation omitted).

Zahtz argues that Martinez has provided no evidence "from which a reasonable trier of fact could conclude that Dr. Zahtz's clinical judgments were so far afield of accepted standards of practice as to implicate" Martinez's Eighth Amendment rights. (Mem. [135] at 5.) In response, Martinez contends that Zahtz's deliberate indifference can be inferred because (1) at Martinez's initial visit on April 11, 2018, Zahtz "dismissed" Martinez's condition as "merely a case of indigestion and heartburn" and doubted that Martinez's symptoms were the result of an infectious illness, attributing them instead to Martinez's "non-descript change in diet"; and (2) based on those initial impressions, Zahtz proceeded to treat Martinez "with minimal care and follow-up treatment that departs from minimally competent medical judgment." (Opp. [144-1] at 9.) In reply, Zahtz insists that, despite arguing that Zahtz deviated from the standard of care in treating him, Martinez has not asserted any facts "establishing what [the standard of care] is or how [Zahtz] deviated from it." (Reply [149] at 1.) The court agrees that Zahtz is entitled to summary judgment on this ground.

18

From April 11, the date of Martinez's first visit with Zahtz, until July 3, 2018, the date Zahtz determined that Martinez's salmonella infection had resolved, Martinez had at least 11 medical appointments at Dixon related to his gastrointestinal issues: one with Zahtz on April 11; five with Nurse Practitioner Tuell on April 13, 16, 20, and 23, and May 3; and five more with Zahtz on May 10, 15, and 24, June 6, and July 3. During that span, Martinez was treated with at least eight medications described above (Pepto Bismol, Imodium, Tylenol, Prilosec, Flagyl, Ultram, Simethicone, and Ciprofloxacin), was admitted to the infirmary twice, underwent two rounds of stool sample testing, and had an x-ray performed on his abdomen. While Martinez's symptoms, especially his abdominal pain, never completely abated, Martinez reported improvement in his condition at several points during this course of treatment, particularly with respect to his diarrhea. Finally, there is no evidence in the record that, after Martinez began to report a recurrence of his gastrointestinal issues in November 2018, Zahtz made any decision that delayed Martinez's gastrointestinal consultation and later procedures at UIC in April and September 2019, which led to Martinez's diagnosis with post-infectious irritable bowel syndrome.

To be sure, the "receipt of some medical care does not automatically defeat a claim of deliberate indifference." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citation omitted). But Martinez has failed to identify any instance during the course of his treatment where he made a complaint to Zahtz and Zahtz either denied him treatment entirely or prescribed a course of treatment without examining Martinez or assessing his condition. What Martinez presents in opposition to summary judgment is a series of strongly-worded disagreements with Zahtz's exercise of his clinical judgment.

As Martinez sees things, based on the symptoms he presented at his initial visit with Zahtz, Zahtz should have known or at least suspected that Martinez was not merely suffering from indigestion, and should have ordered some manner of testing, directed staff at Dixon to monitor Martinez's symptoms closely, and prescribed an "increase in fluids or bland diet" in the meantime.

19

(*See* Opp. [144-1] at 9–10.) Martinez characterizes Zahtz's decision to prescribe him Pepto Bismol and Imodium as a "total failure" to provide him "any meaningful treatment," causing Martinez to experience severe pain on April 13, 2018, and leading to Martinez's crisis call. (*Id.* at 10.) Martinez also asserts that Dr. Zahtz "failed to act" in response to that crisis call. (*Id.*) But it is undisputed that it was Nurse Practitioner Tuell, not Dr. Zahtz, who treated Martinez on the day of his crisis call. Martinez does not appear to take issue with Tuell's treatment decisions that day, and does not explain what, if anything, Zahtz could or should have done beyond what Tuell did.

The list goes on. Martinez next contends that Zahtz "improperly delayed adequate testing"; the argument appears to be that, after Dr. Fisher of Wexford denied Tuell's request for a GI panel by PCR on April 24, 2018, and after Martinez complained to Tuell on May 3 that his symptoms had worsened, Zahtz should have resubmitted the request sooner than May 10, the date on which Zahtz next saw Martinez. (*See id.*) Martinez argues that Zahtz's decision to renew Martinez's course of Flagyl on May 10 was improper because Martinez's symptoms had not completely resolved with the prior course of the antibiotic and because the medication's side effects "potentially" exacerbated Martinez's gastrointestinal symptoms.[4] (*Id.* at 11.) Finally, Martinez argues that Zahtz improperly failed to refer Martinez for a gastrointestinal consultation during the summer of 2018, a decision based on Zahtz's observation on May 24 that Martinez's diarrhea was resolving. (*Id.*)

Perhaps this evidence would permit a reasonable jury to conclude that Martinez could have received better or speedier care. But recall that the Eighth Amendment does not guarantee prisoners access to the best care possible; it does not even protect them from negligence. *See supra* at 17. What Martinez must prove is that Zahtz's treatment decisions were such a grievous

---

[4] To be clear, Martinez offers no evidence in support of the assertion that taking Flagyl ever exacerbated his symptoms, and as described above, has offered no evidence regarding how common the gastrointestinal of side effects are, or whether they are common enough that physicians avoid prescribing it to patients with Martinez's presentation.

departure from standard procedure as to evidence "something approaching a total unconcern" for Martinez's welfare. *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (citation omitted).

On this record, it is difficult to imagine how Martinez could make a showing sufficient to support a jury verdict on deliberate indifference. Whether Zahtz was "right or wrong about the source" of Martinez's symptoms or used "the best diagnostic tools" to identify that source, Martinez, like the plaintiff in *Ray v. Wexford Health Sources, Inc.*, "received medical treatment from several" medical practitioners, was "examined often," had x-rays taken, and was prescribed multiple medications that were reasonably targeted at his particular symptoms. *See* 706 F.3d 864, 866 (7th Cir. 2013). To create a triable issue of fact as to deliberate indifference, Martinez would need, at minimum, expert testimony to establish that "norms of professional conduct" in the field of medicine obviously called for treatment choices very different from those Zahtz opted for. *Id.*; *see also Petties*, 836 F.3d 729 (in the "medical context," some deliberate indifference cases require "specialized expertise" to reveal "the implications of a particular course of treatment.")

In a sur-reply, Martinez admits such expertise would be required here and that he has not yet presented it. (*See* Pl. Sur-Reply [150-1] at 2 (stating that "this is a case where expert testimony on the standard of care is necessary.")) He nevertheless insists that summary judgment is not appropriate here because (1) Martinez has cited "abundant medical literature" in his Statement of Additional Facts at summary judgment that creates an issue of fact as to the appropriate standard of care, and (2) Martinez has now retained an expert to testify on this topic at trial. (*Id.* at 1–2.)

The court finds no "abundance" of medical literature cited in Martinez's Statement of Additional Facts. That statement appears to cite just one piece of evidence that could be described as medical literature: an article about Flagyl downloaded from the UpToDate medical database, cited as evidence for the assertion that Flagyl can cause gastrointestinal side effects.

21

(*See* PSOAF ¶ 8.)  In any event, neither the Statement of Additional Facts nor Martinez's briefing

contain any clear assertions of what the standard of care would have required at any given point

in Martinez's treatment; they simply raise questions as to whether Martinez could have received

better care.  This is not enough to create a genuine issue regarding the standard of care.

Moreover, though Martinez contends he is prepared now to present expert testimony at

trial, a party seeking to defeat a motion for summary judgment is "required to wheel out all its

artillery" to do so.  *Cannon v. Armstrong Containers Inc.*, 92 F.4th 688, 700 (7th Cir. 2024) (citation

omitted).  Martinez cannot prevail by assuring the court that evidence he has not yet collected—

or at least, failed to include in the record—will be enough to sway a jury. [5]  The court notes, further,

that Martinez has failed to explain or even preview by what reference or metric the purported

---

[5]     Martinez complains that the court misled him by suggesting that it would allow for expert testimony after the conclusion of fact discovery.  (Sur-Reply [150-1] at 2 n.1.)  True, the court stated months ago that it would allow the parties to collect expert discovery after summary judgment motions were filed, but it also clearly set dates by which all discovery relevant to summary judgment was to have concluded; despite being prompted, Martinez never signaled to the court or defense counsel that he intended to rely on expert testimony at summary judgment or that dates for summary judgment should not be set pending its completion.  Nor had the court at any point *barred* Martinez from seeking expert testimony.

A note about the procedural history:  This case was filed in March 2021; recruited counsel for Plaintiff filed an appearance in July 2022.  More than two years later, after its reassignment to the undersigned judge, the court set a discovery close date of January 24, 2025, with summary judgment motions to be filed by February 14, 2025.  ([124].)  During a status hearing at the time this schedule was set, the court noted that the parties had scheduled four depositions for the month of November 2024 and then asked counsel to identify any other witnesses whose depositions must to be scheduled before summary judgment briefing.  (*See* Oct. 15, 2024 Hr'g Tr. [142] at 5:4–6:9.)  Martinez's counsel responded that they still needed to schedule depositions of a Rule 30(b)(6) witness from Wexford Health, and three or four nurses from IDOC, but made no mention of an expert witness.  (*Id.* at 6:10–21.)  The court then set the date of January 24, 2025 for the close of discovery; while the court noted that the parties would be welcome to proceed with expert discovery after that date, it also reiterated that it would assume any discovery not conducted by the January 24 deadline was "not important enough" to factor into summary judgment.  (*See id.* at 7:12–18.)

On January 22, 2025, the parties submitted a joint motion for extension of the January 24 discovery deadline for the limited purpose of completing the depositions of Zahtz and two IDOC nurses.  ([130].)  The court granted the motion, extending the close of discovery to February 14, 2025, and the summary judgment deadline to February 28, 2025.  ([131].)  The joint motion again made no mention of a need for expert discovery prior to summary judgment.

expert would establish a gross departure from the standard of care on Zahtz's part in this case. That some medical professionals might have taken different action is not sufficient for this purpose, as a mere "difference of [medical] opinion" is "insufficient to support [a finding of] deliberate indifference." *Murphy v. Wexford Health Sources Inc.*, 962 F.3d 911, 916 (7th Cir. 2020); *see also Petties*, 836 F.3d at 729 ("[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim."). As in *Martin v. Obaisi,* No. 17 C 4328, 2022 WL 523119, at *5 (N.D. Ill. Feb. 22, 2022), "[i]f this [were] a medical malpractice case, the expert disagreement might be a good reason to deny summary judgment." But the question in a case alleging deliberate indifference "is not whether [the plaintiff's] treatment met the reasonable standard of care, but whether it was so deficient that no minimally competent professional would have undertaken to treat [the plaintiff's condition] in that manner." *Id*.

Zahtz's motion for summary judgment is granted.

## II. Wexford Health

Under the *Monell* doctrine, a plaintiff who has suffered a constitutional violation may recover from a municipality if they have evidence of "(1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the 'moving force'" behind the constitutional injury. *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020) (citation omitted). In the Seventh Circuit, private corporations acting under color of state law—as Wexford has in this case and many others—are treated as municipalities and may be liable under the *Monell* doctrine. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citations omitted).

As discussed above, Martinez has failed to show that Zahtz's conduct violated his Eighth Amendment rights. That in itself is not necessarily fatal to his claim: as the Seventh Circuit has

23

explained, in "unusual" instances, there may be a basis for *Monell* liability in Eighth Amendment medical care cases even where no individual official was deliberately indifferent, but where municipal or corporate policies were "themselves deliberately indifferent to the quality of care provided." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc).

Here, however, Martinez has provided no evidence of a policy or practice of Wexford, let alone that those policies caused him to receive substandard care. The evidence Martinez cites in support of the notion that Wexford personnel writ large employ an inappropriate "wait and see" approach to the practice of medicine—the deposition testimony of Tuell and Zahtz—either does not support the assertion or directly contradicts it. What the evidence Martinez provided shows is that Tuell and Zahtz took the "wait and see" approach to treating Martinez, specifically, based on his presentation at certain points—not in adherence to any Wexford policy.

Martinez's claim that Wexford's collegial review process for approving certain off-site procedures is overseen by offsite doctors with "no knowledge" of the patient's history is similarly unsupported. (*See* Opp. [144-1] at 15.) And while Wexford does not contest that it "adhere[s] to cost efficiency" as a general matter, its doing so as a general matter is not objectionable. (*See id.* at 14.) "[A]dministrative convenience and costs" can be "permissible factors for correctional systems to consider in making treatment decisions"; the Constitution is violated when those factors are "considered to the *exclusion* of reasonable medical judgment about inmate health." *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011) (emphasis added). Martinez has not pointed to any instance in his particular case where a reviewing Wexford physician's decision to not approve or delay treatment was made without exercising medical judgment, let alone that such conduct occurs with such frequency as to constitute a "widespread practice."

Martinez's *Monell* claim fails.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment [136] is stricken

24

as moot.  Defendants' Merrill Zahtz and Wexford Health Source, Inc.'s motion for summary judgment [133] is granted.  The Clerk is directed to enter judgment in favor of Defendants.

ENTER:

Dated: September 16, 2025

_____
REBECCA R. PALLMEYER
United States District Judge

25